**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**REGINA M. DONOVAN, individually**
**and o/b/o A.M.Y., an Infant,**

                              **Plaintiff,**

    **-v-**                                                              **3:19-CV-1638**

**NORWICH CITY SCHOOL DISTRICT,**
**THE CITY OF NORWICH, NEW YORK,**
**GERARD O'SULLIVAN in his official capacity as an**
**Employee of the Norwich City School District,**
**SCOTT  RYAN in his official capacity as an employee**
**of the Norwich City School District, and JOSEPH**
**DOWNEY, in his official capacity as an employee of**
**the Norwich City School District,**

                              **Defendants.**

_____

**THOMAS J. McAVOY,**
**Senior United States District Judge**


                    **DECISION and ORDER**

## I.    INTRODUCTION

Plaintiff Regina M. Donovan, individually and on behalf of her daughter, A.M.Y.,

commenced this action through counsel asserting that defendants violated her and her

daughter's rights in connection with criminal charges brought against Donovan.  These

criminal charges, which were dropped after Donovan was indicted, arose because

Donovan purportedly stated during a March 20, 2018 telephone conversation with Norwich

Middle School official Joseph Downey: "If someone touches my daughter again, I will

1

make it rain blood on the Norwich Middle School." *See* Second Am. Compl. ("SAC"), Dkt. 27, Ex. A.  Presently before the Court are Defendant the City of Norwich, New York's ("City") motion to dismiss the claims against it, Dkt. 29; the Norwich City School District ("School District"), Gerald O'Sullivan, Scott Ryan, and Joseph Downey's (collectively, "School District Defendants") motion to dismiss the claims against them, Dkt. 34; and Plaintiff's motion to amend the SAC. Dkt. 38.

## II.   MOTION TO AMEND

The Court starts with Plaintiff's motion to amend to determine the operative pleading to which to apply the dismissal motions.

The Federal Rules of Civil Procedure provide that "leave to amend the pleadings should be 'freely give[n] . . . when justice so requires.'" *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 725 (2d Cir. 2010)).  Generally, courts in this Circuit have permitted "'a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith.'" *Id.* (quoting *Block v. First Blood Assocs*., 988 F.2d 344, 350 (2d. Cir. 1993)).  Still, "motions to amend should generally be denied in instances of futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the non-moving party." *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 126 (2d Cir. 2008) (citing *Forman v. Davis*, 371 U.S. 178, 182 (1962)).

In support of her motion to amend, Plaintiff presents her counsel's affirmation.  *See*

Drazen Affirm., Dkt. 38-1.[1]  Although Counsel asserts the proposed third amended

complaint is annexed to his affirmation, it is not.  While Plaintiff references some of the

proposed amendments in her opposition to the defendants' motions, Plaintiff has not

provided a complete copy of the proposed third amended complaint.

"An amended complaint is intended to replace and supercede in its entirety the

previous complaint.  Once accepted for filing, the amended complaint becomes the

operative pleading, and the original complaint is no longer considered." *Bennett v.*

*Fletcher*, No. 9:17-CV-849 (GTS/CFH), 2018 WL 557885, at *1 (N.D.N.Y. Jan. 18,

2018)(citing *Dluhos v. Floating & Abandoned Vessel, Known as New York*, 162 F.3d 63,

68 (2d Cir. 1998)("[I]t is well established that an amended complaint ordinarily supersedes

the original, and renders it of no legal effect.")). "This requirement is buttressed by the

---

[1]Counsel asserts:

2. Adding in school board members, and defendants O'Sullivan, Ryan and Downey in their individual capacity are proposed amendments of form, and in that connection, the names of school board members are added to the caption, and they are referenced in paragraph 5. The words individual capacity are also added anywhere O'Sullivan, Ryan and Downey are referenced in their official capacity in the complaint.

3. For clarity's sake, each reference to final decision makers is changed to "final policymakers".

4. The other proposed amendment adding the following to paragraph 68 "As a result, she was unable to communicate with others in the manner she previously had, as well as prevented from organizing and/or advocating with other parents as she had planned to do - and had told school officials she would do - due to the time and energy consumed in defending herself, and due to the stigma of being charged as a domestic terrorist". An affidavit from plaintiff justifying the proposed amendment's inclusion accompanies these papers.

5. Arguments and citations of law in support of the cross motion, and opposing defendants' respective motions to dismiss accompany these papers, and for convenience, all proposed amendments are outlined and underlined in red in the annexed proposed third amended complaint, sans exhibits which would remain the same.

Drazen Aff., Dkt. 38-1.

Local Rules of Practice of this District ("Local Rules")." *Id.*

Local Rule 15.1(a) provides in pertinent part:

A party moving to amend a pleading . . . must attach an unsigned copy of the proposed amended pleading to its motion papers. Except if the Court otherwise orders, the proposed amended pleading must be a complete pleading, which will supersede the pleading sought to be amended in all respects. A party shall not incorporate any portion of its prior pleading or exhibits thereto into the proposed amended pleading by reference.

N.D.N.Y. L.R. 15.1(a).  "One of the purposes of the requirement that an amended complaint be itself a complete pleading is to ensure that all of the allegations asserted against the defendants are contained in a single document, thereby reducing the likelihood that a party will overlook one or more allegations against him." *Bennett,* 2018 WL 557885, at *1 (citation omitted). "This requirement also eliminates the confusing nature of 'piecemeal' amended complaints." *Id.* (citation omitted).  "In other words, an amended complaint must include all of the allegations against each of the defendants against whom the case is going forward so that the amended complaint may stand alone as the sole complaint in the action." *Id.*  The failure to provide a complete proposed amended complaint is sufficient reason to deny a motion to amend as it precludes the Court from "examin[ing] the exact amendment that it is being asked to permit[;] ... ensur[ing] that all of the allegations asserted against the [defendants] are contained in a single document[;] ... [and] eliminat[ing] the confusing nature of piecemeal amended pleadings." *Allevato v. Howard*, No. 9:21-CV-1159 (GTS), 2022 WL 42436, at *2, n. 2 (N.D.N.Y. Jan. 5, 2022)(quoting *Cusamano v. Sobek*, 604 F. Supp.2d 416, 508 (N.D.N.Y. 2009)).  This rule is "not merely technical in nature," *Cusamano,* 604 F. Supp.2d at 508, and Plaintiff had a prior motion to amend denied, in part, because she failed to comply with Local Rule

4

15.1(a). *See* 02/16/21 Dec. & Ord., Dkt. 26, at 4.

Plaintiff's motion to amend again fails to comply with Local Rule 15.1(a). While the Court could adjourn the motions and allow Plaintiff to submit a proposed third amended complaint, she has not requested permission to do so even though defendants raise the Local Rule 15.1(a) deficiency. *See* Dkt. 41-1 at 2; Dkt. 43 at 23. Moreover, as discussed below, an adjournment would be contrary to the interests of justice and the speedy resolution of this case.

Plaintiff seeks to add the names of School District board members to the caption and paragraph 5 (describing "Defendant Norwich City School") although their names are not provided. *See* Drazen Affirm. ¶ 2. It would be unfair to the existing defendants, and to the unnamed School District board members, to allow the proposed amendment on this incomplete record. Furthermore, and perhaps more importantly, it appears that Plaintiff seeks to add school board members in response to the School District Defendants' contention that municipal liability against the School District can only be accomplished by suing the Norwich City School District Board of Education or its members. *See* Dkt. 34-1 at 9-12. This appears to be part of Plaintiff's practice of seeking to amend the complaint in response to defendants' motions to dismiss in order to cure deficiencies in the pleading. As the City points out, the SAC on the docket is the fifth iteration of the complaint. Each time defendants moved to dismiss claims in this action, Plaintiff responded by amending, or seeking to amend, the complaint to rectify deficiencies defendants raised in their

motions.[2]  The Court expects that Plaintiff's counsel would have analyzed the pertinent

legal issues presented by the claims in the SAC and included in that pleading all factual

and legal bases to withstand a motion to dismiss.  It is unfair to the defendants to file

several motions addressed to claims arising under the same facts only to allow Plaintiff

additional time to rectify purported deficiencies in her pleading pointed out by the

defendants. The Court will not allow this multiple-amendment approach to pleading to

further delay this matter.

Similarly, Plaintiff seeks to add a substantive allegation to paragraph 68, seemingly

to provide a basis to conclude that her First Amendment free speech rights were chilled by

---

[2]The original Complaint was filed on December 31, 2019. Dkt. 1.  In February 2020, the School District and City filed motions to dismiss arguing the pleading deficiencies undermined Plaintiff's claims. Dkt. 4, Dkt. 6.  Rather than respond to the motions, on March 9, 2020 Plaintiff filed an Amended Complaint as of right, adding allegations in an apparent attempt to avoid the arguments presented in the defendants' motions. In light of the Amended Complaint, the Court denied defendants' initial dismissal motions as moot. *See* Dkt. 15. In March 2020, defendants again filed dismissal motions, this time addressed to the Amended Complaint. *See* Dkt. 11; Dkt. 13.  Again, rather than respond to the motions, in April 2020, Plaintiff attempted to submit a Second Amended Complaint without consent of opposing counsel or leave of the Court, and refused to withdraw it even when the City pointed out that she could not do so.  Instead, Plaintiff left the Second Amended Complaint on the docket and immediately filed a cross-motion for leave to file the Second Amended Complaint, again without actually responding to the dismissal motions.

The Court issued a decision in February 2021 that struck the Second Amended Complaint filed without consent or Court permission, and denied Plaintiff's cross-motion to file the proposed second amended complaint because (1) Plaintiff failed to comply with N.D.N.Y.L.R. 15.1; and (2) Plaintiff did not address defendants' substantive arguments for dismissal of the claims in the Amended Complaint, identify where in the proposed second amended complaint factual allegations existed to legally support Plaintiff's claims, or present any opposition to the request for an order directing a more definitive statement, leaving "the parties – and the Court – to sort through thirty-one pages of often-repetitive and prolix allegations in an effort to determine what, if anything, Plaintiff had added in the way of facts to address the alleged deficiencies in [their] claims." Dkt. 26 at 4.  The Court also found that Plaintiff's manner of pleading failed to comply with Fed. R. Civ. P. 8(a)(2) and thus deprived Defendants of fair notice of what Plaintiffs' claims were and the grounds upon which they rested.  *See id.* at 7.  Accordingly, the Court denied without prejudice to renewal the defendants' motions to dismiss, and *sua sponte* granted leave "to file a second amended complaint that complies with Fed. R. Civ. P. 8 and 10." *Id.* at 11.  Thereafter, Plaintiff filed the SAC, Dkt. 27.  This constituted the fifth iteration of the Complaint in fourteen months, and came after the defendants' several motions providing detail as to what the pleading needed to adequately present Plaintiff's claims.  Defendants then submitted motions addressed to this fifth pleading (the third Second Amended Complaint).  After these motions were submitted, Plaintiff asked for leave to amend yet again, describing (but not providing) a proposed third amended complaint.

defendants' actions. *See id.* ¶ 4. The circumstances underlying this proposed amendment appear to have existed at least by the time the Court granted leave to file the SAC on February 16, 2021, and therefore should have been included in that pleading.

Plaintiff also seeks to amend the SAC so that it names Defendants O'Sullivan, Ryan and Downey in their individual capacities, and add "[t]he words individual capacity . . . anywhere O'Sullivan, Ryan and Downey are referenced in their official capacity [sic] in the complaint." Drazen Affirm. ¶ 2. It is unclear whether Plaintiff intended to sue Defendants O'Sullivan, Ryan and Downey in the SAC in their individual capacities. The SAC's caption names them in their official capacities only, and the SAC indicates throughout that these defendants acted, or failed to act, in their official capacities. *See generally* SAC. However, these defendants, who were named for the first time in the SAC, were each served summonses, and Plaintiff brings claims against them separate from the claims against the School District. The question of whether Plaintiff filed only official capacity claims against these defendants in the SAC and now wants to bring individual capacity claims against them has substantive significance. *See, e.g., Tanvir v. Tanzin*, 894 F.3d 449, 459 (2d Cir. 2018) ("In an official capacity suit, the real party in interest is the governmental entity and not the named official. By contrast, individual capacity suits seek to impose individual liability upon a government officer for her actions under color of law.")(citations omitted). It seems Plaintiff concedes that if individual capacity claims are now asserted against these defendants, they would be entitled to hire their own counsel. *See* Dkt. 38-4, p. 26 ("It is respectfully submitted that apart from perhaps having to obtain their own counsel, Ryan, Downey and O'Sullivan will not be

7

unduly prejudiced as they are already on notice of the nature of plaintiff's claims.").  To allow Ryan, Downey and O'Sullivan the opportunity to explore retaining separate counsel would require the motions be adjourned, further delaying the proceedings.  An amendment without this opportunity could prejudice Ryan, Downey and O'Sullivan.

In addition, Plaintiff seeks to change each reference in the SAC from "final decision makers" to "final policymakers." *See id.* ¶ 3.  Without a complete proposed third amended complaint showing all the amendments in redline version as required by Local Rule 15.1(a), the defendants and Court are required to search through the 90-page, 379-paragraph SAC to determine where the proposed amendments apply.  While not an insurmountable chore because it is a proposed global amendment, it is Plaintiff's job to do this - not that the defendants' or the Court's.  Furthermore, as pointed out by the defendants, the amendment has substantive significance when determining whether Plaintiff has asserted viable claims under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  The proposed amendment appears to be a reaction to defendants' motions to dismiss the *Monell* claims, and Plaintiff's counsel should have realized the distinction between "final decision makers" and "final policymakers" when the SAC was filed.

Plaintiff has failed to comply with Local Rule 15.1(a), and any adjournment of the motions will cause undue delay arising from Plaintiff's failure to cure deficiencies through prior amendment.  Under the particular circumstances of this case, delaying this case any longer is contrary to the interests of justice and the speedy resolution of this case resulting in prejudice to the defendants.  Accordingly, Plaintiff's motion to amend is denied.  The Court proceeds to analyze the dismissal motions as applied to the SAC.

### III.    ALLEGATIONS IN THE SAC

The SAC alleges that Plaintiff's daughter, A.M.Y., was born "with a disabling physiological condition/genetic disorder known as Prader-Willi Syndrome, which has noticeable physical characteristics, and affects A.M.Y.'s musculoskeletal and digestive systems to the extent it substantially limits her activities involving those systems." SAC  ¶ 4.   Plaintiff contends that her daughter "was being regularly taunted and terrorized verbally and physically at school about her disabling condition by a group of her fellow male students" at Norwich Middle School.  *Id.* ¶ 13.  On the morning of March 20, 2018, Plaintiff emailed the Norwich Middle School Principal, Defendant Ryan, "indicating if action was not taken to address the situation with her child, she would be taking her concerns to higher authorities."  *Id*.  at 16.   At 9:42 AM that day, Plaintiff received a telephone call from "Norwich Middle School official Joseph Downey."  *Id.* ¶ 12.   "The ostensible reason for the call, which Downey told plaintiff was being recorded, was to address plaintiff's repeatedly expressed concerns to school officials about how her daughter" was being treated by fellow students. *Id.* ¶ 13.  Plaintiff believes that Ryan directed Downey to call in response to Plaintiff's email earlier that day. *Id.* ¶ 16.  During the phone call, Plaintiff

> rejected Downey's explanation of what plaintiff believed were school officials' minimization of the issue, voiced her dissatisfaction to Downey about the nonchalant and/or dismissive way it was being handled, and asserted that talking to the students bullying her daughter about their behavior had been tried repeatedly without result. She told him that due to the lack of action to protect her daughter, she would seek intervention by authorities in the state or federal education departments, as well as speak with an attorney about civil action against the school district.

*Id.* ¶ 17.

"[A]t approximately 11:42 AM [on March 20, 2018] a call complaining about plaintiff

was made to the Norwich Police Department by a school district official, of whose identity plaintiff is unaware." *Id.* ¶ 18.  Donovan "believes during the approximately two hour time period between the end of Downey's call to her, and the call to the police, Downey sought and received instructions from defendant Ryan, and from ranking school district officials, including defendant O'Sullivan - whose offices are housed within the same building as the Norwich Middle School - on how to proceed, and that such a call to the police would not have occurred without such officials' knowledge or consent, and reflected a school district policy, or the decision of school district final decision makers." *Id.* ¶ 19.  "The police incident report lists defendant Ryan and defendant O'Sullivan as persons involved, along with plaintiff and Downey." *Id.* ¶ 20.  "At no point since then has any school district official disavowed the course of action taken that day, or disavowed any subsequent actions taken by the school district, nor has any school district official indicated Downey acted on his own, without authorization, or in violation of any school district policy." *Id.*  Downey told the police that during his telephone conversation with Donovan, she stated: "If someone touches my daughter again, I will make it rain blood on the Norwich Middle School." *See* SAC, Ex. A.

At 4:00 PM on March 20, 2018, Donovan received a telephone call from someone at the Norwich Police Department "who led her to believe they were concerned about what was happening to her daughter at the school, that they wanted to help, and asked her to come in to the station, so they could talk to her about it." *Id.* 21.  Plaintiff voluntarily went and was interviewed for approximately three hours by various officers. *Id.* ¶¶ 22-41.  A portion of the interviews "was videotaped and preserved by police, as the

recording of the plaintiff being questioned by the uniformed officers was subsequently produced in connection with the criminal matter." *Id.* at 41.  During the interviews Donovan explained the problems her daughter was having with other students and the failure of the School District to rectify the situation despite Donovan's threats to take civil action against the District (including in her email to Ryan earlier that morning), asserted that she believed that "what was occurring was retaliation for her trying to advocate for/protect her daughter," asked to hear the recording of the telephone call with Downey (which she was told the police did not have and which Donovan does not believe the police ever listened to "as no recording of the conversation has ever emerged"), denied making a threat to commit a violent act, told police that were witnesses to her talking on the phone with Downey (although the police made no contact with these witnesses), demanded that charges be pressed against Downey for making a false deposition, and believes she was handcuffed in the booking room "as an intimidation tactic to force an admission from her." *Id.* ¶¶ 22-41.  In a voluntary statement given to the City of Norwich Police Department on March 20, 2018, Plaintiff describes her conversation with Downey during which she purportedly expressed frustration with the School District's inadequate response to her complaints about how her daughter was treated by other students, and contends: "I then said that I had contacted New York State Department of Education and they're going to launch an investigation and its going to rain at your school; your faculty will be fired."  SAC Ex B, p. 3.

During one interview on March 20 at the police station, a "non-uniformed police official" told Donovan "that Mr. Downey - son of a former Norwich City Court judge - was a known local figure, and she was not, so she was unworthy of belief." SAC ¶ 32.  Plaintiff

11

asserts that "[t]he official kept re-iterating how reputable, and influential Mr. Downey and his family were, and essentially repeating his effort to get plaintiff to change her story." *Id*. ¶ 33. Plaintiff contends that she "believes - based on the manner in which she was treated, and the manner in which she was told she was unworthy of belief- the Norwich Police Department's separation of people into the class worthy of belief, and that unworthy of belief, because of who they knew or who knew them, reflected a policy, custom or a practice approved, or silently assented to by final decision makers in the Norwich Police Department and in Norwich city government." *Id.* ¶ 39. Plaintiff asserts that she "now knows of another individual involved in a dispute with a member of another former local judicial official's family, subjected to similar mistreatment during roughly the same time frame she was." *Id.* ¶ 40. "During the criminal proceeding, plaintiff's demand for any other video recording of her time at the police station - after initial indication it did exist - was ultimately met with a response that no other video existed." *Id.* ¶ 42.

The police released Plaintiff with an appearance ticket for Aggravated Harassment in the Second Degree in violation of N.Y. Penal Law § 240.30(1). *Id.* ¶ 46, and Ex. A. Plaintiff was later arraigned on this charge and released on her own recognizance. *Id.* ¶ 47. The March 23, 2018 Criminal Information charging Plaintiff with Aggravated Harassment in the Second Degree alleges:

> The said defendant did, with intent to harass, annoy, threaten , or alarm another person, communicated by telephone with the victim, JOESEPH (sic) DOWNEY, by stating "If someone touches my daughter again, I will make it rain blood on the Norwich Middle School". All contrary to the provisions of the statute in such case made and provided.
>
> The foregoing factual allegations are based upon information and belief, the sources of complainant[']s information and belief being, a sworn statement

12

by the victim, JOESEPH (sic) DOWNEY, and an investigation conducted by the City of Norwich Police Department.

SAC Ex. A.  Downey's Supporting Deposition recounts the afore-mentioned threat as well as other parts of his March 20, 2018 telephone conversation with Plaintiff.  *Id.*

Donovan was later notified that a felony charge would be lodged against her based upon what occurred on the phone call with Downey.  A felony complaint made by Norwich Police Detective Sergeant Reuben Roach, supported by Downey's statement, was received by the Norwich City Court March 23, 2018 at 4:15PM.  SAC ¶ 49. "Plaintiff believes the more serious charge was lodged with defendants' final decision makers' full knowledge and at least some input, and was done with no regard to the truth, but was intended as a further retaliatory measure, and a means of pressuring her into pleading guilty to something, or otherwise compelling her to put herself in a position that she could take no civil action against defendants, particularly the school district." *Id.*

On May 18, 2018, a grand jury indicted Donovan on the felony charge of Making a Terrorist Threat in violation of N.Y. Penal Law § 490.20.  *Id.* ¶ 50.  Donovan asserts that she

> is unaware of who testified or the substance of the Grand Jury testimony, but maintains a belief deliberately false statements, or those attributable to plain incompetence were made to induce the Grand Jury to indict her, since she committed no act constituting conduct prohibited by section 490.20, or by any other Penal Law provision, and further believes defendants knew or should have known from the very outset, no basis existed for claiming reasonable expectation or fear of plaintiff's imminent commission of such offense as two hours elapsed between the alleged imminent threat, and a call to the police, and over three hours after that until police contacted her.

*Id.* ¶ 51.

The matter made the broadcast and print news locally, around New York State, as

13

well as in the Orlando, Florida area, the Columbus, Ohio area, and other areas
nationwide.  *Id.* ¶ 52.  "Those events stunned and overwhelmed plaintiff, causing her
extreme distress, loss of sleep, and substantial disruption of her regular activities outside
of work."  *Id.* ¶ 53.  "When things settled down slightly in June 2018, plaintiff was looking
back through her emails" and discovered in her Google e-mail (or "gmail") account an
e-mail from Downey, purportedly sent on March 21, 2018.  This e-mail stated:

> I have not been able to sleep all night. I want to apologize for not being
> completely honest yesterday in the report I filed. I hope you did not get into
> any trouble as I was caught in the moment and stretched the truth.  I am
> going to correct what I said. I am so sorry never (sic) thought it would go this
> far. I preach to children how honesty is most important but I my self (sic)
> found my self (sic) in a situation yesterday altering words. I promise I will
> retract my statement.

*Id.* ¶ 54 and SAC Ex. C.  Plaintiff contends that she "contacted Google to verify the
electronic path the email took from Downey's computer over the school district's server to
plaintiff's account," *id.* ¶ 55, and that "Google supplied plaintiff with a printout certified with
raised seals upon each page, showing the email had in fact come from Downey over the
school district servers." *Id.* ¶ 57.  The printout was sent under cover of a letter from
Google's legal department.  *Id.*; *see* SAC Ex. E.[3]  "Based at least in part upon the Downey

---

[3]The letter from Google's Legal Department has no address or telephone number, no personal
identification of any legal department representative, no signature or signature line, and contains several
typographical errors and odd syntax.  The body of the letter provides:

Dear Miss. (sic) Donovan,

As you requested the march (sic) 21, 2018 email you received from a one Mr. Downey has
been preserved and validated as authentic. The email has but (sic) put on record in our legal
dept (sic) and has been issued a document number 18-ac2972. The file will remain for a
period of 2 years or until other wise (sic) told to dispose of. Our office has given you a copy of
the complete path in which the email was delivered to our server.

Please feel free to contact us further if you need any further assistance.

(continued...)

14

email, plaintiff moved through counsel to dismiss the charges against her in July 2018, which motion was denied." *Id.* ¶ 56

On November 2, 2018, Donovan appeared in Chenango County Court with counsel, "and despite plaintiff's proof - presented in hand there to the Chenango County District Attorney, with police officials, including the arresting officer and Detective Sergeant Roach present - that the only other individual with personal knowledge of what occurred in the March 20, 2018 phone conversation had disavowed their claim as to what occurred, the charges against plaintiff continued, and pre-trial hearings scheduled." *Id.* ¶ 58. Thereafter, "the Norwich Police Department sought a warrant to get all plaintiff's email records between March 20, 2018 and October 25, 2018 from Google." *Id.* ¶ 59. Donovan, "through motion by counsel returnable December 10, 2018, tried to have the warrant denied and/or quashed, pointing out again with police officials present that the chief complaining witness had certifiably disavowed his initial statement. But plaintiff's motion was denied, and a pre-trial hearing held over plaintiff's counsel's objection." *Id.* ¶ 61. Donovan asserts that:

> [a]lthough whatever supported the warrant application was never revealed to plaintiff, plaintiff verily believes deliberately false statements, or those attributable to plain incompetence, were made by Norwich Police officials to secure the warrant, that such statements were made at the instance of school officials and were based upon representations made by school district officials they and the police knew to be untrue, or that should have been known to be untrue and, that the sole basis for seeking the warrant was to fish for unfavorable, embarrassing, and/or incriminating material about plaintiff, so the school district could manage to be shielded from or evade

---

[3](...continued)
Go gle (sic) Legal Dept (sic)

future civil liability to plaintiff.

*Id.* ¶ 62.  Plaintiff contends that "[o]ther than Downey's and school district officials' like Ryan and O'Sullivan's say so, plaintiff believes no reasonable grounds existed for any warrant application to be made, as the notion she, as an auto parts store employee, had sufficient specialized knowledge and skill to mimic the communications of someone to whom she had spoken only one time, then create an email from that person, infiltrate it into the school district's servers, and fool Google into certifying it, is totally implausible." *Id.* ¶ 63.  Plaintiff also asserts that no proof existed that she hired someone to do these things, and contends that no further charges against her "arose from whatever materials were secured under the warrant."  *Id.* ¶¶ 64-65.

On April 15, 2019, the newly-elected District Attorney opted "to move for dismissal of the indictment against plaintiff, which was granted April 17, 2019 in the interests of justice, and mailed to plaintiff's counsel April 23, 2019."  *Id.* ¶ 67.

> 69. Plaintiff believes that in advance of criminal charges being brought against plaintiff by the Norwich Police at the school district's instance, during the Grand Jury process, as well as after plaintiff's motion to dismiss the charges against her, and in applying for the search warrant, school district officials and the Norwich Police conspired by concerted action to accomplish an unlawful purpose by unlawful means, namely to criminally charge the plaintiff for exercising her constitutionally protected and statutorily guaranteed rights, and to unlawfully employ the Penal Law of New York State, as well as the Grand Jury process and search warrant application process available under New York's Criminal Procedure Law, as a means for shielding the school district from civil liability to the plaintiff for their failure to uphold their legal obligations to plaintiff as a parent of a special needs child, as well as their legal obligations to plaintiff's child as a student with disability and an IEP.
>
> 70. Plaintiff's belief in that regard is based, at least in part, upon a March 22, 2018 public statement made by defendant O'Sullivan published in the Norwich Evening Sun newspaper, indicating the matter was discussed at a

school board meeting held the day after plaintiff was charged. He is quoted as saying "[w]e did a brief investigation, we called the police, sent out an email to all staff ... We thought it warranted the attention of the Norwich Police who followed up with an investigation." A copy of the March 23, 2018 Norwich Evening Sun article is attached as exhibit "h".

71. Plaintiff is unaware of any demand the school district or defendant O'Sullivan made for that statement to be revised or retracted, or any school district claim that Downey acted without authority.

72. The article containing defendant O'Sullivan's statement also indicated the school district and police had been meeting, would be meeting regarding school safety issues, and that Det. Sergeant Ruben Roach would be involved for the Police Department. Plaintiff was never contacted by any school district investigator, or is she aware that any other witnesses she named to police were contacted.

73. Plaintiff further believes when at the police station, and officers/officials were leaving the rooms in which she was held, they were communicating with those at the final decision making level about how to proceed, and that those at the final decision making level for both institutional defendants were communicating with each other on how to proceed, and that defendant city of Norwich final decision makers were watching the video feed of plaintiff being questioned live, based upon the allegation of an imminent mass casualty event involving children.

74. She also believes that the initial charge could never have been brought without communication and/or agreement between school district officials and the police, and that it can be reasonably inferred from Downey's email to plaintiff as well as the accusatory instrument he signed, he had spoken to the police, and had done so with approval from and/or based upon consultation with someone at the final decision making level in the school district.

75. Plaintiff similarly believes the felony complaint against her was issued in consultation with and the agreement of those at the final decision making level of both institutional defendants, that the Grand Jury either heard from Downey directly, or from police via hearsay, and that in either event such testimony could not have occurred without at least some agreement, communication and/or coordination between the school district and police.

76. Plaintiff also believes that in the approximately two hours between Downey's call to her, and the call to the police, Downey, Ryan and O'Sullivan concocted the claim that plaintiff had threatened a mass casualty event in her conversation with him, when she had only reiterated the statement she

made to Ryan via email earlier that day stating she would be going to higher authorities with her complaints, and/or engaging counsel to pursue civil action, and that the concocted claim was intended to stop plaintiff from doing so.

77. Plaintiff believes that if Downey testified before the Grand Jury, he did so with final decision making school district officials' knowledge, consent and at their direction, that any police testimony was based on communications with Downey and/or other school district officials like Ryan and O'Sullivan.

78. Plaintiff also believes that once the police learned of Downey's email to plaintiff, they communicated and/or coordinated with him in their efforts to get a search warrant, that such an effort was based upon Downey's denial he sent the email or his suggestion plaintiff had somehow been able to concoct it, and that final decision making school district officials were at the very least aware of such communication and/or coordination, if not directly involved, as the email had gone out over their servers.

79. Plaintiff further believes that since the Police Chief is designated by Norwich City Charter as having "[j]urisdiction and control over all functions and duties customarily conferred upon a police department and police officers pursuant to the laws of the State of New York", and since the charges and allegations against her involved significantly more serious and broad ranging implications than usual - a possible mass casualty event involving children - police actions taken in relation to them could not have occurred without final decision makers' knowledge and approval, and that due to the seriousness of the allegations, such people were aware of events as they were happening, or very shortly thereafter, and were giving direction regarding any actions taken against plaintiff.

80. Plaintiff believes such actions and failures to act by the institutional defendants, and the individual defendants acting in their official capacity (sic) were taken at the direction of those with final decision making authority on such matters, and/or with their approval, toleration and ratification, were all performed with malice and premeditation under color of state law with willful and wanton disregard of plaintiff's constitutional and statutory rights.

*Id.* ¶¶ 69-80.

Donovan "duly served a notice of claim June 3, 2019 upon the school district, which had been previously served notices June 27, 2018 and July 6, 2018, and duly served the city July 12, 2019." *Id.* ¶ 81.

## IV.    STANDARD OF REVIEW

To survive a motion to dismiss, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The plaintiff must provide factual allegations sufficient "to raise a right to relief above the speculative level." *Id.* (quoting *Twombly*, 550 U.S. at 555).  The Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See Marcotte v. City of Rochester*, 677 F. App'x 723, 724 (2d Cir. 2017); *E.E.O.C. v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The complaint must contain "more than labels and conclusions, and a formulaic recitation of a cause of action will not do." *Twombly,* 550 U.S. at 555.  "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010).  "A complaint must allege facts that are not merely consistent with the conclusion that the defendant violated the law, but which actively and plausibly suggest that conclusion." *Port Dock & Stone Corp. v. Old Castle NC. Inc.*, 507 F3d 117, 121 (2d Cir. 2007); *see Mayor & City Council of Balt.*, 709 F.3d at 135 ("a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.'").  Unless a plaintiff's well-pleaded allegations have "nudged [her] claims across the line from conceivable to plausible," the complaint must be

dismissed. *Twombly*, 550 U.S. at 570.  Stated a different way, a plaintiff must provide

factual allegations sufficient "to raise a right to relief above the speculative level." *Mayor &*

*City Council of Balt.*, 709 F.3d at 135.  "Determining whether a complaint states a

plausible claim for relief . . . requires the . . . court to draw on its judicial experience and

common sense. . . . [W]here the well-pleaded facts do not permit the court to infer more

than the mere possibility of misconduct, the complaint has alleged–but it has not

shown–that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (internal citation and

punctuation omitted).

## V.   DISCUSSION

### a.  The City's Motion to Dismiss

Plaintiff does not sequentially number her causes of action against all defendants,

but rather groups them against each defendant. The SAC purports to present the following

causes of action against the City:

> First Claim: First Amendment free speech violation;
> Second Claim: First Amendment retaliation;
> Third Claim: Fourth Amendment unlawful seizure;
> Fourth Claim: Fourteenth Amendment due process violations;
> Fifth Claim: Fourteenth Amendment due process violation based on deprivation of liberty interests;
> Fifth Claim (second): Fourteenth Amendment due process violation based on deprivation of liberty interests;
> Sixth Claim: Fourteenth Amendment equal protection violation;
> Seventh Claim: Rehabilitation Act "interference;"
> Eighth Claim: Americans with Disabilities Act retaliation;
> Ninth Claim: Negligence;
> Tenth Claim: Negligent failure to train or supervise;
> Tenth Claim (second):Negligent failure to train or supervise (via Section 1983);
> Eleventh Claim: Intentional infliction of emotional distress;
> Twelfth Claim: Violation of New York State Human Rights Law;
> Thirteenth Claim: Violation of state constitutional provisions;
> Fourteenth Claim: Violation of state constitutional provisions; and

Fifteenth Claim: Violation of state constitutional provisions.

SAC ¶¶ 142-207.

### 1.  Municipal Liability

The City maintains that Plaintiffs' First, Second, Third, Fourth, Fifth, Fifth (second), Sixth, and Tenth (second) Claims must be asserted via 42 U.S.C. § 1983, and may only be brought against the City if the alleged violations were the acts of the City itself – that is, pursuant to a policy, custom, or practice satisfying the requirements of liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  The City argues that because the SAC presents no nonconclusory allegations meeting those requirements, the claims fail.  Plaintiff counters that City "final policymakers" approved or ratified all actions taken against Plaintiff.  Dkt. 38-4 at 7-9.

"[A] municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691.  Rather, a municipality is liable when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Id.* at 694.  "To hold a municipality liable in such an action, 'a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right.'" *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995) (quoting *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983)).  Where, as here, there is no formal policy officially promulgated by the municipality in issue, municipal policy may arise from

> action taken by the official responsible for establishing policy with respect to a particular issue, *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483–84 (1986);

unlawful practices by subordinate officials so permanent and widespread as to practically have the force of law, *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127–30 (1985); or a failure to train or supervise that amounts to "deliberate indifference" to the rights of those with whom the municipality's employees interact, *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).

*Hill v. Cty. of Montgomery*, No. 9:14-CV-00933 (BKS/DJS), 2019 WL 5842822, at *17 (N.D.N.Y. Nov. 7, 2019).

A single act by a municipality may amount to municipal policy "if ordered by a person 'whose edicts or acts may fairly be said to represent official policy.'" *Rookard v. Health & Hosps. Corp.*, 710 F.2d 41, 45 (2d Cir. 1983)(quoting *Monell*, 436 U.S. at 694); *see Montero v. City of Yonkers, New York*, 890 F.3d 386, 403 (2d Cir. 2018)("[W]hen a municipality 'chooses a course of action tailored to a particular situation,' this may also 'represent[ ] an act of official government 'policy' as that term is commonly understood.'")(quoting *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 125 (2d Cir. 2004), in turn quoting *Pembaur*, 475 U.S. at 480-81). "Where an official has final authority over significant matters involving the exercise of discretion, the choices he makes represent government policy." *Rookard*, 710 F.2d at 45*; see Montero*, 890 F.3d at 403 ("'[E]ven a single action by a decisionmaker who possesses final authority to establish municipal policy with respect to the action ordered' may deprive the plaintiff of his or her constitutional rights.")(quoting *Amnesty Am.*, 361 F.3d at 126, in turn quoting *Pembaur*, 475 U.S. at 481). *"An official has final authority if his decisions, at the time they are made, for practical or legal reasons constitute the municipality's final decisions." Rookard*, 710 F.2d at 45 (citation omitted). "An allegation of policy-making authority thus requires proof of the official's scope of employment and his role within the municipal or corporate

22

organization." *Id.* (citation omitted).  "An official's title, though not dispositive of his authority to make policy, is relevant for the inferences fairly to be drawn therefrom." *Id.* (citation omitted).

"When a non-decisionmaker committed the constitutional violation, however, the plaintiff must show that the decisionmaker ordered or ratified such a subordinate's conduct or 'was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions.'" *Montero*, 890 F.3d at 403  (quoting *Amnesty Am.*, 361 F.3d at 126); *see Bowers v. City of Salamanca*, No. 20-CV-1206-LJV, 2021 WL 2917672, at *3 (W.D.N.Y. July 12, 2021)("'[A] municipal policy may be inferred from the informal acts or omissions of supervisory municipal officials,' such as 'the persistent failure to discipline subordinates who violate [persons'] civil rights.'")(quoting *Zahra*, 48 F.3d at 685).

Plaintiff argues in opposition to the City's motion that given "a possible mass casualty event involving children," a City final policymaker such as the Mayor would have been alerted to the circumstances and either monitored police action or directed it. Dkt. 38-4 p. 8.  "Mayors may be treated as policy-makers without proof of their specific powers and responsibilities. Lesser officials, however, cannot similarly be presumed to embody plenary municipal power."  *Rookard*, 710 F.2d at 45, n. 4.  Plaintiff's speculation that the Mayor was aware of Donovan's criminal charge and prosecution and directed or allowed it to continue is not based on facts from which a plausible inference could be drawn that the Mayor was actually aware of the events in issue, or that the Mayor directed police action or allowed it to continue.  First, it is alleged that Donovan told Downey that if someone

touched her daughter again she would make it rain blood on the Norwich Middle School. The threat was contingent on some further action involving Donovan's daughter.  As Plaintiff argues, "[n]othing prevented the police from refraining from acting precipitously, as they knew there was no imminent threat." Dkt. 38-4 pp. 20-21.[4]  It is not a plausible inference that the Mayor would be included in discussions involving a threat arising from what was essentially a dispute between a parent and the school district about how Donovan's daughter was being treated by other students.  Second, Plaintiff provides no allegations from which to reasonably infer that the Mayor was actually involved in or advised of Donovan's arrest and criminal prosecution.  Her speculation is insufficient. Third, after Donovan's arrest and charges laid by the police, the criminal prosecution was essentially handled by the District Attorney.  "When prosecuting a criminal matter, a district attorney in New York State, acting in a quasi-judicial capacity, represents the State." *Baez v. Hennessy*, 853 F.2d 73, 77 (2d Cir. 1988), *cert. denied*, 488 U.S. 1014 (1989).  Thus, "a district attorney's misconduct in prosecuting an individual could not give rise to municipal liability." *Walker v. City of New York*, 974 F.2d 293, 301 (2d Cir. 1992) (citing Baez, 853 F.2d at 77).  Furthermore, "[w]here a district attorney acts as the manager of the district attorney's office, the district attorney acts as a county policymaker." *Id.*  The Mayor would not have had final decision making authority over the District Attorney in either of these roles.  While Donovan alleges that the City police were involved in the request for the

---

[4]The Court draws no conclusion as whether the purported threat met the requirements of a charge under New York Penal Law § 490.20(1), which provides that "[a] person is guilty of making a terroristic threat when with intent to intimidate or coerce a civilian population, influence the policy of a unit of government by intimidation or coercion, or affect the conduct of a unit of government by murder, assassination or kidnapping, he or she threatens to commit or cause to be committed a specified offense and thereby causes a reasonable expectation or fear of the imminent commission of such offense."

search warrant, she does not assert that the Mayor was involved in this action, and it is not a reasonable inference that the Mayor would be involved in or consulted about such proceedings in a criminal case.  Under these circumstances, Plaintiff fails to plausibly allege that the Mayor's actions or omissions established municipal policy with respect to the particular issues in this case.  *See Pembaur*, 475 U.S. at 483–84.

Plaintiff also asserts that the City Police Chief had jurisdiction and control over matters involving the City police department's actions in issue here.  Donovan believes that since the allegations against her involved "a possible mass casualty event involving children," police action in this matter "could not have occurred without final decision makers knowledge and approval," and she believes that these final decision makers were "giving direction regarding any actions taken against plaintiff."  SAC ¶ 79.  Plaintiff further believes the "actions and failures to act by the institutional defendants, and the individual defendants acting in their official capacity (sic), were taken at the direction of those with final decision making authority on such matters, and/or with their approval, toleration and ratification."  *Id.* ¶ 80.

Plaintiff has plausibly alleged that the Police Chief is a final policymaker for purposes of some of the relevant events, that is, to the extent the Chief had the authority to train, supervise and/or discipline officers, and to enforce policies and procedures for the police department.  *See Ocasio v. City of Canandaigua*, 513 F. Supp. 3d 310, 325 (W.D.N.Y. 2021).  That being the case, however, Plaintiff's contention that the Chief was actually aware of and involved in City police officers' actions relative to Donovan's arrest, charge, and prosecution is based upon mere speculation.

Citing to a newspaper article about Donovan's arrest, SAC Ex. H, Plaintiff contends:

25

> Surely during ongoing meetings between school officials and city police regarding school safety (complaint exhibit "h"), a mass casualty contingency plan was developed or contemplated, and how school officials and city officials would communicate in such circumstances was at least to some degree planned in advance. It's hard to believe as part of such arrangements school officials would be expected to wait two hours prior to alerting police about a terroristic threat. It's also hard to imagine top officials willing to be in a position of having to say on the day after, that they knew nothing of events as they were developing with the terroristic threat, and left leadership decisions to others. It seems far more likely that in the face of such a threat, anyone and everyone in authority would know relatively quickly, especially if there had been any kind of advance planning and coordination between school and city officials, as suggested by the District Superintendent in a public statement the day after the alleged terroristic threat occurred (exhibit "h").

Doc. No. 38-4, p. 8.   The newspaper article does not support Plaintiff's contention that there were "ongoing meetings between school officials and city police regarding school safety" and that "a mass casualty contingency plan was developed." *See* SAC Ex. H.[5]

Furthermore, the article does not mention the Police Chief.

Likewise, Plaintiff's allegation that she believes that "school district officials and the Norwich Police conspired by concerted action to accomplish an unlawful purpose by

---

[5]The newspaper article Donovan cites indicates only that District Superintendent Gerald O'Sullivan provided an update at a Board of Education meeting on the District's efforts to be prepared for any internal or external crisis.  It also indicates that the District did a brief investigation about Donovan's threat, called the police, and sent out an email to all staff. According to the article, O'Sullivan indicated "he thought it warranted the attention of the Norwich police who followed up with an investigation."  O'Sullivan indicated that the District had not received any recommendations from law enforcement on how to handle Donovan's  situation, indicating that the matter would be handled through the legal system, although he indicated that the District would be moving forward "in a more productive manner" including holding a student assembly to remember the Parkland shooting victims, scheduling an active shooter drill, sending students from the middle school and the high school to attend a school safety summit to discuss school safety issues, and hosting a multi-agency meeting with the New York State Police, the Chenango County Sheriff's Office, the Norwich Fire Department, emergency responders, members of the City of Norwich, and Chenango Memorial Hospital. The article indicates that the multi-agency meeting "comes after O'Sullivan met with Norwich Police Department Detective Ruben Roche and Norwich Fire Fighter Jason Gray on March 15," which was before Donovan's arrest on March 20, 2018 so that meeting could not have addressed Donovan's purported threat or police action related thereto.

unlawful means, namely to criminally charge the plaintiff for exercising her constitutionally protected and statutorily guaranteed rights, and to unlawfully employ the Penal Law of New York State, as well as the Grand Jury process and search warrant application process available under New York's Criminal Procedure Law, as a means for shielding the school district from civil liability," SAC ¶69, is insufficient to plausibly establish that the asserted conspiracy existed or that the Police Chief was part of it.

Plaintiff has not asserted an independent conspiracy claim, and her assertion of a conspiracy between the City police and the School District fails to present factual allegations plausibly supporting the existence of the alleged conspiracy.  To establish a § 1983 conspiracy, "a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999) (collecting cases).  A complaint alleging a § 1983 conspiracy must allege more than "conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights." *Ciambriello v. Cty. of Nassau*, 292 F.3d 307, 325 (2d Cir. 2002)(quoting *Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir. 1993)).  "In setting forth the claim, a plaintiff must make an 'effort to provide some details of time and place and the alleged effects of the conspiracy ....'" *Ocasio*, 513 F. Supp. 3d at 323 (quoting *Ivery v. Baldauf*, 284 F. Supp.3d 426, 439 (W.D.N.Y. 2018)).

Plaintiff's contention that the City police's motivation for going forward on the criminal charges was to protect the School District from civil liability is based on nothing

more than mere speculation.  Even if the City police had been aware of evidence of improper motivations on the part of the School District, that is not enough to show conspiracy.  It is not a factual allegation plausibly suggesting the City police and the School District came to an agreement and a meeting of the minds to persecute Plaintiff Donovan for exercising her rights. *See id.* ("Plaintiffs do not allege any specific meeting of the minds. They fail to allege that Kadien and the DOCCS defendants knew or communicated with one another. In sum and substance, their conspiracy claim amounts only to allegations that defendants jointly filed a false report.")(quotation marks, citations and brackets omitted); *see also Webb v. Goord*, 340 F.3d 105, 110 (2d Cir. 2003) (a conspiracy claim under 42 U.S.C. § 1985 requires allegations showing a "meeting of the minds," such that the defendants entered into an agreement to achieve an unlawful end). Plaintiff's claim of the lapse in time between her alleged threat and the School District's report to the police, and the temporal connection between Donovan's email to Ryan that she would be pursuing remedies and the School District's report to the police, may support Donovan's claim that the School District made the report to the police to retaliate against her, but it does not bear on the plausibility of her claims against the City or the existence of the asserted conspiracy.  Furthermore, Plaintiff does not allege that the Police Chief was involved in the purported conspiracy.  Plaintiff fails to assert facts plausibly establishing that the Police Chief was actually involved in and made decisions relative to Donovan's arrest and prosecution such to amount to municipal policy with respect to these and related issues.  *See Pembaur*, 475 U.S. at 483–84.

Nevertheless, citing to *Zahra*'s statement that "a municipal policy may be inferred

from the informal acts or omissions of supervisory municipal officials," Plaintiff contends that the Police Chief likely knew of Donovan's criminal charge and prosecution and allowed it to continue, establishing *Monell* liability because the Police Chief was a "supervisory official." DKt. 38-4, pp. 8-9.[6]  Plaintiff argues that the Police Chief ratified or acquiesced in police action in this matter.

Plaintiff has not adequately alleged *Monell* claims against the City premised on a theory of ratification.  "Municipal policy" for purposes of *Monell* liability "includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v.*

---

[6]In this regard, Plaintiff argues:

[I]t seems highly likely the Police Chief would be well aware of a nearly three hour ongoing interrogation of someone his officers say made a terrorist threat to the school. It seems also seems [sic] highly likely under such circumstances the Police Chief would be watching the interrogation in real time, or being briefed in near real time, and that during those nearly three hours he would have spoken with the mayor of the city, to keep them up to speed on events, and perhaps seek some guidance.

DKt. 38-4, p. 9.

Plaintiff continues by arguing:

[T]he notion that the city's actions taken against plaintiff March 20, 2018 due to what police believed was a terroristic threat to the school, were based solely on choices of those beneath the final policy making level, seems highly improbable. It also seems highly improbable officials like the Police Chief and mayor would stop being interested in what occurred the day after, and that they would continue closely following events to the later stages, like when plaintiff introduced certified proof that the only witness other than plaintiff to the phone call that precipitated events disavowed their initial statement (par. 56-58; exhibits "c", "d" and "e").

Ample opportunity arose for such final policy making officials to intervene, but they refused. It also seems highly likely that in the course of his contacts with the school about school safety Sgt. Detective Roach would be updating policymakers at the school, as was suggested/implied by the school superintendent's public statements (exhibit "h"), including the decision to bring the felony charge March 23, 2018. That such a decision was made with approval of city policymakers seems much more likely than without approval.

*Id.*

*Thompson*, 563 U.S. 51, 61 (2011).  "[W]here senior personnel have knowledge of a pattern of constitutionally offensive acts by their subordinates but fail to take remedial steps, the municipality may be held liable for a subsequent violation if the superior's inaction amounts to deliberate indifference or to tacit authorization of the offensive acts." *Turpin v. Mailet*, 619 F.2d 196, 201 (2d Cir. 1980).  However, to state a *Monell* claim premised on ratification, a plaintiff must plausibly allege that the unconstitutional conduct which the municipal policymaker ratified was part of "a pattern of constitutionally offensive acts," rather than an isolated event. *Ocasio*, 513 F. Supp. 3d at 325.  "In order to state a claim for ratification of repeated unconstitutional acts, there must be 'well-pleaded allegations in the complaint supporting the inference that the City employed a policy of ratifying the unlawful conduct of its officers': a 'single instance' of ratification is insufficient." *Id.* (quoting *Waller v. City of Middletown*, 89 F. Supp. 3d 279, 287 n.3 (D. Conn. 2015), in turn quoting *Batista*, 702 F.2d at 398; and citing *Deferio v. City of Syracuse*, 770 Fed. Appx. 587, 591 (2d Cir. 2019)(holding that a *Monell* claim premised on ratification requires allegations that constitutional liberties were "systematically" violated: a "single incident of illegality" cannot, by itself, evidence a "custom")(unpublished opinion)(quoting *Turpin*, 619 F.2d at 202)).

Plaintiff has not plausibly alleged that the purportedly unconstitutional conduct of arresting and charging Donovan despite her claims of innocence, of seeking a search warrant, or providing evidence from the police investigation to a grand jury (if in fact the City made some decisions or played some role in the District Attorney's grand jury presentation), and allowing the prosecution to continue despite Plaintiff's presentation of

evidence that Downey recanted his claim (presuming the City played some role in the decision to continue the prosecution) amounted to ratification by the Police Chief or some other senior supervisory personnel of "a pattern of constitutionally offensive acts," rather than isolated events.  The closest the SAC comes to alleging a purported pattern or "persistent and widespread" practice is in paragraphs 39 and 40, where Plaintiff claims that she was told she was "unworthy of belief," and asserts that this represented a practice by the City's police department of treating people differently based on "who they knew." SAC ¶ 39.  Plaintiff claims to know of "another individual involved in a dispute with a member of another former judicial official's family [who was] subjected to similar mistreatment."  *Id.* ¶ 40.  However, two instances are insufficient to plead a widespread or persistent practice to justify the imposition of municipal liability.  *See Jones v. Town of East Haven*, 691 F.3d 72, 85 (2d Cir. 2012)(concluding that evidence of two or three instances in which police officers "abused the rights of black people" fell "far short of showing a policy, custom, or usage of officers to abuse the rights of black people, and far short of showing abusive conduct among officers so persistent that it must have been known to supervisory authorities"); *Giaccio v. City of New York*, 308 F. App'x 470, 472 (2d Cir. 2009) (stating that the plaintiff "identifie[d], at most, only four examples where the defendants might have disclosed positive drug test results," and holding such "evidence [fell] far short of establishing a practice that is so persistent or widespread as to justify the imposition of municipal liability" (citations and internal quotation marks omitted); *LoPorto v. Cty. of Rensselaer*, No. 1:15-CV-0866 (LEK/DJS), 2018 WL 4565768, at *19 (N.D.N.Y. Sept. 24, 2018)("[T]he fact that Plaintiff can only point to two allegedly unlawful

prosecutions—his own and McDonough's—undermines his claims of widespread, systemic wrongdoing and fails to support an inference that Rensselaer had a policy or practice of wrongfully prosecuting criminal defendants.").

Plaintiff has also not adequately alleged *Monell* claims premised on a theory of acquiescence by the Police Chief or some other senior supervisory personnel.  "[W]here a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a 'deliberate choice,' that acquiescence may 'be properly thought of as a city "policy or custom" that is actionable under § 1983.'" *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 126 (2d Cir. 2004)(quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)) (internal citation omitted).  "To prove such deliberate indifference, plaintiffs must show that the need for more or better supervision to protect against constitutional violations was obvious." *Ocasio*, 513 F. Supp. 3d at 325 (citing *Canton*, 489 U.S. at 390).  "'An obvious need may be demonstrated through proof of repeated complaints of civil rights violations [and] deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents.'" *Id.* (quoting *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995), in turn citing *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991)).

Furthermore, under *Zahra* and the cases it cites*,* municipal policy can arise from supervisory officials' conduct involving "persistent failure to discipline subordinates who violate [persons'] civil rights," "evidence that the municipality had notice of but repeatedly failed to make any meaningful investigation into charges that police officers had used

excessive force," and "where senior personnel have knowledge of a pattern of constitutionally offensive acts by their subordinates but fail to take remedial steps." *See Zahra*, 48 F.3d at 685.[7]   Indeed, in concluding that "Zahra failed to establish that the Town had a municipal policy that rendered it liable for any deprivation of Zahra's constitutional rights," the Circuit cited to *Turpin* in concluding that "Zahra did not present evidence demonstrating that the Town's purported inaction constituted deliberate indifference or tacit encouragement of a violation of his constitutional rights." *Zahra*, 48 F.3d at 685 (citing *Turpin*, 619 F.2d at 201).   *Turpin* stands for the proposition that municipal liability can arise from senior supervisory personnel's inaction in situations concerning a pattern of constitutionally offensive conduct.   *See Turpin*, 619 F.2d at 201 ("where senior personnel have knowledge of a pattern of constitutionally offensive acts by their subordinates but fail to take remedial steps, the municipality may be held liable for a subsequent violation if the superior's inaction amounts to deliberate indifference or to tacit authorization of the offensive acts"); *Lucente v. County of Suffolk*, 980 F.3d 284, 306 (2d Cir. 2020)("'[E]ven if a policy can be inferred from omissions of a municipality, such as where it acquiesces in a

---

[7]In *Zahra*, the Second Circuit stated:

We have previously ruled that a municipal policy may be inferred from the informal acts or omissions of supervisory municipal officials, *Turpin v. Mailet*, 619 F.2d 196, 200 (2d Cir.), *cert. denied*, 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980), and that "municipal inaction such as the persistent failure to discipline subordinates who violate [persons'] civil rights could give rise to an inference of an unlawful municipal policy of ratification of unconstitutional conduct," *Batista*, 702 F.2d at 397. *See also* [*Ricciuti v. New York City Transit Auth.*, 941 F.2d 119, 123 (2d Cir.1991)] (policy may be inferred from "evidence that the municipality had notice of but repeatedly failed to make any meaningful investigation into charges that police officers had used excessive force in violation of the complainants' civil rights"); *Turpin*, 619 F.2d at 201 ("where senior personnel have knowledge of a pattern of constitutionally offensive acts by their subordinates but fail to take remedial steps, the municipality may be held liable for a subsequent violation if the superior's inaction amounts to deliberate indifference or to tacit authorization of the offensive acts").

48 F.3d at 685.

pattern of illegal conduct, such a policy cannot be inferred from the failure of those in charge to discipline a single police officer for a single incident of illegality'; instead, there must be 'more evidence of supervisory indifference, such as acquiescence in a prior pattern of conduct.'")(quoting *Turpin*, 619 F.2d at 201-02)).

Here, there are no plausible allegations of a persistent failure to discipline subordinates or a pattern of constitutionally offensive acts by City police officers.  Instead, Plaintiff's claims involve the singular event of Donovan's arrest and prosecution. Under these circumstances, the acts or omissions of the Police Chief or other senior supervisory personnel do not represent official City policy.  *See Deferio*, 770 Fed. Appx. at 591 (holding that a *Monell* claim premised on a theory of ratification of illegal acts requires allegations that constitutional liberties were "systematically" violated: a "single incident of illegality" cannot, by itself, evidence a "custom")(quoting *Turpin*, 619 F.2d at 202); *Ocasio*, 513 F. Supp. 3d at  325("Plaintiffs have not plausibly alleged that the unconstitutional conduct which Hedworth ratified was part of a pattern of constitutionally offensive acts, rather than an isolated event. In order to state a claim for ratification of repeated unconstitutional acts, there must be well-pleaded allegations in the complaint supporting the inference that the City employed a policy of ratifying the unlawful conduct of its officers: a single instance of ratification is insufficient.")(internal quotation marks and citation omitted).

For the reasons discussed above, Plaintiff's claims against the City under Section 1983 (Plaintiffs' First, Second, Third, Fourth, Fifth, Fifth (second), Sixth, and Tenth (second) Claims) fail as a matter of law and are dismissed.

### 2. Rehabilitation Act and ADA Claims

Plaintiff's claims under the Rehabilitation Act and the Americans with Disabilities Act ("ADA") against the City (Seventh and Eighth Claims) are deficient because Plaintiff has not plausibly alleged the City or its police officers took any actions based on A.M.Y.'s disability or Donovan's opposition to discrimination relating to A.M.Y.'s disability.

To allege a violation of the ADA or the Rehabilitation Act, a plaintiff must provide adequate factual allegations that she is a qualified individual with a disability; that she was excluded from participating in a public agency's services, programs, or activities, or otherwise discriminated against by the public entity; and, that such exclusion or discrimination was due to her disability. *Fulton v. Goord*, 591 F.3d 37, 43, 42 n.1 (2d Cir. 2009). "To recover compensatory damages under the ADA or the Rehabilitation Act, a plaintiff must prove that the defendant exhibited 'deliberate indifference' as to the 'strong likelihood' that its actions were unlawful under the statutes." *Feltenstein v. City of New Rochelle*, 254 F. Supp. 3d 647, 657 (S.D.N.Y. 2017)(quoting *Loeffler v. Staten Island University Hosp.*, 582 F.3d 268, 275 (2d Cir. 2009)). "In this context, a plaintiff demonstrates deliberate indifference by pointing to evidence the official with authority to address the alleged discrimination and to institute corrective measures on Plaintiff's behalf had actual knowledge of ongoing discrimination against Plaintiff but failed to respond adequately." *Id.* (quotation marks and citations omitted). "A defendant's actions must demonstrate 'deliberate choice ... rather than negligence or bureaucratic inaction.'" *Id.* (citing *Reynolds v. Giuliani*, 506 F.3d 183, 193 (2d Cir. 2007)).

As the City notes, Plaintiff alleges the City police began taking actions adverse to

Donovan before she revealed her daughter was disabled or that she had threatened to bring litigation against the School District over alleged disability discrimination.  Plaintiff's insistence that she did not make a threat against the School District, and that Downey "disavowed his sworn deposition less than 24 hours after he made it," Dkt. 38-4 p. 22, ignores that the City police were provided information that Donovan did make a threat, and that Downey's "disavowal" was not presented to the police until June 2018, roughly three months after Donovan was arrested and charged, and after she was indicted by a grand jury.  The City police's failure to accept Donovan's denial at face value is not plausibly linked by any factual allegation to her daughter's disability.  Furthermore, Plaintiff cannot rely on the e-mail from Downey as shedding any light on the motives of the City police when they questioned Donovan, issued her an appearance ticket, or filed a felony complaint.  Nor do the factual allegations plausibly support Plaintiffs' claim that the issuance of a search warrant – which was the sole act of the City police allegedly undertaken after the revelation of the e-mail from Defendant Downey – was prompted by A.M.Y.'s disability or her mother's advocacy on her behalf.

Plaintiff's argument that the delay by the School District in reporting the threat gave the police "ample basis to question [the] school officials['] story from the outset, and to suspect plaintiff was the target of retaliation for defending her child," Dkt. 38-4 p 23, amounts to, at most, an argument that the City police should have suspected the School District was engaging in retaliation.  However, negligence cannot be the basis for a claim under the ADA or the Rehabilitation Act, and Plaintiff has not presented allegations plausibly suggesting that the City police actually knew retaliation was occurring and deliberately aided it.  Further, Plaintiff's claim that the City police were "deliberately

indifferent" to Donovan's descriptions of "violations of well-established rights of hers and her daughter's" by the School District, Dkt. 38-4 p. 23, fails to plausibly establish ADA and Rehabilitation Act claims against the City.  As the City points out, violations of these statutes are not crimes, and the City police do not do not have jurisdiction to enforce the anti-discrimination laws.

For these reasons, Plaintiff's ADA and Rehabilitation Act claims against the City are dismissed.

### 3.  State Law Negligence - Ninth Claim

### A.  Negligent Arrest and/or Prosecution

The City argues that to the extent Plaintiff's negligence claim is for negligent arrest and/or prosecution, no such claim exists under New York State law.  *See* Dkt. 29-3 at 20. In this regard, the City argues that under a claim of general negligence a plaintiff may not recover for a claim that law enforcement officers failed to exercise the appropriate degree of care in effectuating an arrest or initiating a prosecution. *See id.* (citing *Bernard v. U.S.*, 25 F.3d 98, 102 (2d Cir. 1994)("Under New York law, a plaintiff may not recover under general negligence principles for a claim that law enforcement officers failed to exercise the appropriate degree of care in effectuating an arrest or initiating a prosecution."); *Frederique v. County of Nassau*, 168 F. Supp.3d 455, 485 (E.D.N.Y. 2016) (Such a plaintiff is restricted to the traditional remedies of false arrest and malicious prosecution, and cannot recover in negligence.).  Plaintiff has not responded to this argument.

The Local Rules provide that "[w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to

the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting . . . of the motion." N.D.N.Y. L.R. 7.1(a)(3). "In the Northern District, where a plaintiff, in her opposition papers, fails to oppose several arguments by a defendant in its motion to dismiss, 'the movant's burden is lightened such that, in order to succeed, the movant need only show facial merit in support of its motion, which has appropriately been characterized as a lightened burden.'" *Baldwin v. United States*, No. 1:20-CV-214 (GLS/CFH), 2021 WL 431145, at *2 (N.D.N.Y. Feb. 8, 2021)(quoting *Breezee v. Colvin*, No. 5:14-CV-1114 GTS, 2015 WL 5725083, at *2 (N.D.N.Y. Sept. 28, 2015) (citations omitted), and citing *Lefevre v. Cty. of Albany*, No. 1:14-CV-155, 2015 WL 1626005, at *3 (N.D.N.Y. Apr. 13, 2015) (citations omitted) ("The failure to oppose a motion to dismiss a claim is deemed abandonment of the claim, and, in the Northern District of New York, is deemed consent to granting that portion of the motion.")).  Thus, because Donovan failed to respond to the City's argument that a state law claim for unlawful arrest and prosecution cannot be asserted under general negligence principles, the remaining issue is whether the City has "'met its burden to demonstrate entitlement to the relief requested through that argument.'" *Id.* (quoting *Cossey v. David*, No. 9:04-CV-1501, 2007 WL 3171819, at *4 (N.D.N.Y. Oct. 29, 2007)(internal quotation marks and citations omitted)).  The City has met its burden in this regard.  *See Bernard*, 25 F.3d at 102; *Frederique*, 168 F. Supp.3d at 485; *see also Ellis v. Gannon*, No. 10–CV–1373, 2011 WL 5513184, at *6 (E.D.N.Y. Nov. 10, 2011) ("For claims seeking damages based upon a purportedly unlawful arrest and prosecution, a plaintiff must resort to the traditional remedies of false imprisonment and malicious

prosecution and cannot recover under the broader principles of negligence."); *Rheingold v. Harrison Town Police Dep't*, 568 F. Supp.2d 384, 395 n. 3 (S.D.N.Y.2008) ("To the extent that plaintiff is alleging an alternate theory of liability for false arrest, imprisonment and prosecution sounding in negligence, New York does not provide a cause of action under such a theory.").  Accordingly, the Ninth Claim is dismissed to the extent it purports to assert a claim for negligent arrest and/or prosecution.

### B. Failure to Protect A.M.Y.

The Ninth Claim also asserts a negligence claim premised on the theory that the City had various duties relating to protecting A.M.Y. from abuse at school. SAC ¶ 178.  "As a general rule, a municipality may not be held liable for injuries resulting from a simple failure to provide police protection." *Cuffy v. New York*, 69 N.Y.2d 255, 260 (N.Y. 1987). "There exists, however, a narrow class of cases in which we have recognized an exception to this general rule and have upheld tort claims based upon a 'special relationship' between the municipality and the claimant." *Id.*   "The elements of this 'special relationship' are: (1) an assumption by the municipality, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the municipality's agents that inaction could lead to harm; (3) some form of direct contact between the municipality's agents and the injured party; and (4) that party's justifiable reliance on the municipality's affirmative undertaking." *Id.*

Here, there is no allegation Donovan sought the assistance of the City police in regard to the matters involving her daughter, or that the City police made any promises, explicitly or by implication, to take any steps in what was plainly a school matter involving

minor students.  Accordingly,  the Ninth Claim is dismissed to the extent it purports to

assert a claim for negligent failure to provide police protection to A.M.Y.

### 4.  Negligent Failure to Train or Supervise

The "first" Tenth Claim alleges that the City police "allowed such improperly trained,

supervised and disciplined personnel to spoliate or otherwise improperly handle evidence

(the video of the non-uniformed official questioning plaintiff), to interact with school

personnel and plaintiff, to make decisions concerning plaintiff, such that plaintiff, and her

child were unnecessarily subject to the circumstances set forth herein, allowing their law

enforcement function to be effectively hijacked, and their officers used as the school

district's private security arm and civil action prevention squad, willingly and/or negligently

becoming facilitators of retaliation against complaints of sexual harassment, and other

mistreatment of plaintiff's child while in the school's care." SAC ¶ 180.  Plaintiff further

contends that "had they been properly trained or supervised, police would have

recognized what she told them made the matter civil, not criminal. *Id.* ¶ 182.

The City argues that the overall context of Plaintiff's allegations, "most notably [the]

frequent railing at the City police officers' decision to proceed on the information provided

by the school district official rather than accept . . . Donovan's version of events,"

demonstrates that Plaintiff seeks "to challenge the adequacy of the City police officers'

training and supervision with regard to investigative procedures."  Dkt. 29-3 at 21.

Pointing to New York law, the City maintains that claims based on a theory of negligent

training or supervision under these circumstances are properly dismissed because "a

claim for negligent training in investigative procedures is akin to a claim for negligent

investigation or prosecution, which is not actionable in New York." *Russ v. State Employees Federal Credit Union*, 298 A.D.2d 791, 793 (N.Y. App. Div. 2002); *see Brown v. State of New York*, 45 A.D.3d 15, 26 (N.Y. App. Div. 2007)(same); *see also Pandolfo v. U.A. Cable Systems*, 171 A.D.2d 1013, 1014 (N.Y. App. Div. 1991)(claims for negligent prosecution and investigation are barred as a matter of public policy).

Plaintiff has not responded to the argument, and the City has met it burden of establishing entitlement to relief on this argument.  Accordingly, the "first" Tenth Claim is dismissed.

### 5.  Intentional Infliction of Emotional Distress - Eleventh Claim

The City argues that Plaintiff's Eleventh Claim for intentional infliction of emotional distress may not be brought against the City as a matter of public policy.  Dkt. 29-3 at 23 (citing *Crevlin v. Board of Education of City School District of City of Niagara Falls*, 144 A.D.3d 1649, 1650 (N.Y. App. Div. 2016)("[I]t is well settled that public policy bars claims sounding in intentional infliction of emotional distress against a governmental entity."); *Afifi v. City of New York*, 104 A.D.3d 712, 713 (N.Y. App. Div. 2013)("Public policy bars claims alleging intentional infliction of emotional distress against governmental entities.")).

Plaintiff has not responded to the argument, and the City has met it burden of establishing entitlement to relief on this argument.  Accordingly, the Eleventh Claim is dismissed.

### 6.  New York State Human Rights Law Claim-Twelfth Claim

The Twelfth Claim asserts a violation of the New York State Human Rights Law. The City argues that the discriminatory exercise of the police power by a municipality is

not covered by the New York Human Rights Law. Dkt. 29-3, pp. 23-24 (citing *D.H. v. City of New York*, 309 F. Supp.3d 52, 81 (S.D.N.Y. 2018)).  Plaintiff has not responded to or opposed this argument.  The City has satisfied its burden of demonstrating its entitlement to relief as to this claim. *See D.H.*, 309 F. Supp.3d at 81.  Accordingly, the City's motion in this regard is granted and the New York Human Rights Law claim against the City is dismissed.

### 7.  Claims under the New York State Constitution

As the City contends, the Thirteenth, Fourteenth, and Fifteenth Claims assert claims under the New York State Constitution, without any indication that they are founded upon facts distinct from those underlying the Section 1983 claims.  The City argues that because Plaintiff has adequate remedies for such violations under Section 1983 and/or at common law, no state constitutional tort claims may be asserted.  In this regard, the City maintains:

> "Although the New York Court of Appeals has recognized a cause of action for damages based on official conduct violating the State's Constitution, the same court has made clear that such a cause of action is a 'narrow remedy' available only when 'necessary to effectuate the purposes of the State constitutional protections [that the] plaintiff invokes' or 'appropriate to ensure full realization of [the plaintiff's] rights.'" Thus, the state constitutional tort is usually available only in cases in which a plaintiff . . . has no alternative remedy." *Biswas v. City of New York*, 973 F. Supp.2d 504, 522 (S.D.N.Y. 2013) (citing *Brown v. State*, 89 N.Y.2d 172 (1996) and *Martinez v. City of Schenectady*, 97 N.Y.2d 78 (2001)). Here, Plaintiffs have actually attempted to assert Section 1983 claims which the state constitutional tort claims entirely track. The availability of Section 1983 claims precludes recognition of state constitutional tort claims, even if the Section 1983 claims are ultimately unsuccessful. *See, e.g., Wahad v. F.B.I.*, 994 F. Supp. 237, 240 (S.D.N.Y. 1998).

Dkt. 29-3, pp. 24-25.

Plaintiff has not responded to the argument, and the City has met it burden of establishing entitlement to relief on this argument.  Accordingly, the Thirteenth, Fourteenth, and Fifteenth Claims against the City are dismissed.

### 8.  Other Arguments

Because Plaintiff's Ninth, Tenth, Eleventh, Thirteenth, Fourteenth, and Fifteenth Claims are dismissed, the Court need not reach the City's contentions that no timely notice of claim was served as to these purported causes of action, that the Notice of Claim that was served did not include all state law tort causes of action, and that the original Complaint was filed after the expiration of the applicable statute of limitations for these claims.

### b.  School District Defendants' Motion

### 1.  Plausibility of Claims in the SAC

The School District Defendants argue that even when viewed in the light most favorable to Plaintiff, "the allegations fail to make a case for concerted action between the Defendants Gerard O'Sullivan, Scott Ryan and Joseph Downey, the Norwich City School District and the Norwich City Police Department to deprive Plaintiff of her rights guaranteed by the United States Constitution, the Constitution of the State of New York, and the New York Human Rights Law."  Dkt. 34-1 at 5.  The School District Defendants contend that "the allegations of the deprivation of rights are formed from mere conclusory statements founded on the Plaintiffs beliefs, lacking any plausibility." *Id.*   The Court agrees to a certain extent.

The majority of Plaintiff's claims proceed from the proposition that Downey

43

fabricated Donovan's threat, that Downey, Ryan and O'Sullivan agreed amongst themselves to seek to charge Plaintiff with a crime in order to prevent or inhibit her from bringing civil action against the School District, and that to facilitate this scheme policy makers with the School District conspired and participated with the Norwich Police Department to prosecute Plaintiff.  As the School District Defendants cite throughout their briefs, Plaintiff's allegations are based primarily on Plaintiff's speculation as to what occurred at the School District and after the matter was presented to the police. *See* Dkt. 34-1 at 5-6; Dkt. 39 at 2-3.  These bald conclusory contentions supported only by Plaintiff's speculation are insufficient to support a plausible claim of a conspiracy between the School District and the Norwich Police, or claims based on Plaintiff's speculation that the Norwich Police did the School District's bidding through the criminal prosecution. Accordingly, any claim based upon conduct occurring after the School District reported Plaintiff's purported threat to the police must be dismissed.

Nevertheless, there are some facts alleged that, when accepted as true for purposes of this motion and when drawing reasonable inferences in Plaintiff's favor, are sufficient (although barely so) to state plausible claims premised on the proposition that School District personnel and officials agreed amongst themselves to seek to falsely charge Plaintiff with a crime.  Primary to this position is Plaintiff's allegation that Downey sent an email the day after Plaintiff was charged indicating that he "stretched the truth" and "alter[ed] words" as to what Donovan purportedly said during their telephone call. While a factfinder might ultimately find that this claim is unworthy of belief, on this motion the Court must accept as true Plaintiff's allegations.   When the Court accepts as true that Downey admitted that he was incorrect about Donovan's threat, that Donovan threatened

44

civil action against the School District in her email to Ryan on March 20 and in her telephone conversation with Downey that day, that Donovan stated during her conversation with Downey that civil action against the School District would make it rain at the school, and that School District Superintendent O'Sullivan and others discussed the purported threat before bringing the matter to the police, an inference could be drawn that Downey divulged to School Officials that Donovan's statement did not clearly articulate a physical threat but that School District officials determined to seek to prosecute Donovan anyway to stave off any civil liability. That being the case, any claim premised on the decision by a School District policy maker to bring the matter to the police can go forward.

### 2. School District Policy or Custom

The School District Defendants contend that any claim brought against the School District under Section 1983 must be dismissed because Plaintiff fails to allege that any deprivations to her or her daughter were caused by a School District policy or custom.

"Municipal entities, including school districts, are 'persons' within the meaning of § 1983 and therefore subject to suit under that provision." *Nagle v. Marron*, 663 F.3d 100, 116 (2d Cir. 2011) (citing *Monell*, 436 U.S. at 663). "A school district can only be held liable under [§ 1983] if its policy or custom, whether made by its lawmakers or by those whose edicts may fairly be said to represent official policy, inflicts the injury." *Rys v. Grimm*, No. 6:19-CV-1251 (FJS/ATB), 2021 WL 827671, at *10 (N.D.N.Y. Mar. 4, 2021)(internal quotation marks and citations omitted). "This means that a school district can be held liable under § 1983 for conduct that was undertaken pursuant to its own unlawful policy or custom or for the actions of an individual whose actions may fairly be

said to represent official policy." *Id.* (internal quotation marks and initial citation omitted, also citing *Roe v. City of Waterbury*, 542 F.3d 31, 36-37 (2d Cir. 2008) (stating that, "[w]here a plaintiff seeks to hold a municipality liable for a 'single decision by [a] municipal policymaker, the plaintiff must show that the official had final policymaking power ....")) (internal quotation marks, citations, and brackets omitted).  The Second Circuit has clarified "that a municipal employee's authority or discretion to make a 'final decision' is not equivalent to that employee having the authority to set the municipality's policy for reaching such decision."  *Id.* (citing *Agosto v. New York City Dep't of Educ.*, 982 F.3d 86, 98 (2d Cir. 2020)).  "State law determines whether an individual has the authority to adopt rules for the conduct of the municipal government; and a municipality merely going along with discretionary decisions made by its subordinates does not convert them into final policymakers." *Id.* (internal quotation marks omitted, citing *Agosto*, 982 F.3d at 98, 100).

The School District Defendants contend that New York Education Law § 2503 empowers the Norwich City School District Board of Education with the final decision making authority to "prescribe such regulations and by-laws as may be necessary . . . for the general management, operation, control, maintenance and discipline of the schools, and of all other educational, social or recreational activities and other interests under its charge or direction," and "[s]hall have in all respects the superintendence, management and control of the educational affairs of the district, and, therefore, shall have all the powers reasonably necessary to exercise powers granted expressly or by implication and to discharge duties imposed expressly or by implication by this chapter or other statutes." N.Y. Educ. Law § 2503(2) and (3).  The School District Defendants argue that because

Plaintiff did not sue the Board of Education or any of its members, Plaintiff cannot

establish that any deprivation was caused by a municipal policy.

Plaintiff responds to the School District Defendants' argument with supposition.

Plaintiff cites to *Rookard* where the Second Circuit held that a single act by a municipality

may amount to municipal policy "if ordered by a person`whose edicts or acts may fairly be

said to represent official policy,'" that "[w]here an official has final authority over significant

matters involving the exercise of discretion, the choices he makes represent government

policy," and that "[a]n official has final authority if his decisions, at the time they are made,

for practical or legal reasons constitute the municipality's final decisions." 710 F.2d at 45.

Plaintiff contends:

> Surely, the call to police could not have been made absent an official with
> final authority over significant matters in the school district knowing and
> giving the go ahead, especially given the nature of the threat claimed.  Under
> the circumstances, it is difficult to imagine how no one at a policy making
> level in the school district knew of what was going on with plaintiff,
> particularly the day of the supposed threat against the school, not exactly a
> run of the mill occurrence. If the official or officials who initiated the criminal
> process against plaintiff violated policy, action against them surely would
> have occurred, instead of action against plaintiff. Given the nature of what
> school officials claimed, and apparently still claim occurred, inferring final
> policy makers knew and approved of the actions against plaintiff, either while
> they were happening or shortly thereafter, is entirely reasonable.

Dkt. 38-3, pp. 7-8.

This response does not indicate that the Board of Education or any board member

made the decision to call the police, and Plaintiff's speculation that an official with final

authority over significant matters in the School District gave the go ahead to do so does

not indicate who the supposed official was. Furthermore, Plaintiff cites no state law

indicating that any of the individual defendants had this authority, and the Court is not

inclined to do Plaintiff's research for her.

Citing to *Zahra*'s statement that "a municipal policy may be inferred from the informal acts or omissions of supervisory municipal officials," 48 F.3d at 685, Plaintiff contends that "Superintendent O'Sullivan's public statement the day after plaintiff's arrest suggests the school board did know, and approved of the actions taken, by saying, 'We did a brief investigation, we called the police, sent out an email to all staff…We thought it warranted the attention of the Norwich Police who followed up with an investigation.'" Dkt. 38-3 at 8 (quoting SAC Ex. H). Plaintiff contends that "[w]hile O'Sullivan did not specify who 'we' was, it is respectfully submitted he was likely not using the term in the ancient regal sense to reference himself, but rather was referencing those with the policymaking authority in the school district to make the decisions to do what was done." *Id.*

Plaintiff's supposition that O'Sullivan was referring to a final policymaker when he stated that "[w]e did a brief investigation, we called the police," without pointing to a specific final policymaker, is insufficient to draw a reasonable inference that some final policymaker was involved in the decision to file the report with the police. Likewise, Plaintiff relies on supposition when she contends that when O'Sullivan said he sent emails to all staff, "it seems unlikely no email or other communication was made to school board members in the same time frame, or that lower ranking officials would be notified, while higher ranking ones would not. It seems more likely, given the nature of what was alleged to have occurred, that anyone and everyone in authority in the school district was made aware, including school board members." *Id.* Again, Plaintiff's supposition as to what might have occurred is insufficient to raise a reasonable inference that some final policymaker was involved in the decision to file a report with the police.

48

Next, Plaintiff contends that "the public record shows O'Sullivan reported what occurred at a school board meeting the day after plaintiff's arrest, and since no action was taken by the board against any district employee involved, when they could have done so, they must have approved and/or ratified actions taken against plaintiff." *Id.* pp. 8-9. Plaintiff's argument in this regard is insufficient to show that the Board of Education acquiesced in or ratified the decision to report Plaintiff's purported threat to the police. First, Sullivan was speaking to the Board the day after the complaint was made to the police. Advising the Board of the police report a day after it was made does not present a circumstance from which a reasonable inference could be drawn that the Board acquiesced in or ratified the decision to present the matter to the police. Second, as indicated above, municipal policy claims based on the theories of acquiescence in or ratification of municipal employees' unconstitutional conduct requires widespread or persistent conduct by municipal employees.  Here, the alleged unlawful conduct by School District employees was the singular event of presenting Donovan's purported threat to the police. The circumstances do not lend themselves to a reasonable inference that the Board of Education acquiesced in or ratified persistent or widespread unconstitutional conduct by School District employees.  For these reasons, the claims brought pursuant to Section 1983 (First Claim, Second Claim, Third Claim, Fourth Claim, Fifth Claim, Sixth Claim, and Seventh Claim) must be dismissed.

### 3.  Adding Defendants O'Sullivan, Ryan and Downey

The School District Defendants contend that Plaintiff improperly added Defendants O'Sullivan, Ryan and Downey, and claims against them, to the SAC.  Defendants argue

that in *sua sponte* granting Plaintiff leave to file the SAC, the Court instructed Plaintiff to file a Second Amended Complaint that complies with Fed. R. Civ. P. 8 and 10, but made no mention of allowing new Defendants.  Defendants argue that instead of adding a short and plain statement of the claim showing that the pleader is entitled to relief as required by Fed. R. Civ. P. 8, Plaintiff added new claims and new parties which did not serve to rectify the deficiencies in the prior pleading. Plaintiff has not responded to this argument.

At the time the Court granted leave to file the SAC, there were two defendants - the School District and the City.  Defendants are correct that the Court granted leave to file the SAC because the prior pleading failed to comply with Rules 8 and 10 such that the defendants and the Court could decipher the claims Plaintiff intended to bring. However, the Court cannot conclude that the decision granting leave prohibited Plaintiff from adding the individual defendants or bringing claims against him.  Indeed, as indicated above it is unclear on the present record whether Plaintiff intends in the SAC to bring claims against the individual defendants in their official capacities only, which would effectively be claims against the municipality, or whether she intends the SAC to serve as claims against the individual defendants both in their official and individual capacities. At this stage of proceedings, and without argument directed specifically to this issue, the Court will deny the School District Defendants' motion to dismiss on this ground.

### 4.  Timeliness of State Law Claims

The School District Defendants contend that Plaintiff's state law claims are untimely. As defendants indicate, the events complained of herein occurred in March 2018. The complaint was filed on December 31, 2019, almost twenty months following the

first encounter with the Norwich Police Department.  Defendants content that the state law claims are untimely because in New York, an action must be commenced against a school district within one year for all claims except tort. N.Y. Ed. L. § 3813(1).  Tort claims must be filed within one year and ninety days.  *See*  N.Y. Ed. L. § 3813(2), N.Y. Gen. Municipal L. 50-I.

Plaintiff attempts to tie the running of the statue of limitations from January 2020 "when school district officials presumably had an opportunity to meet and discuss the [criminal] matter's status" yet "made no effort to discontinue the criminal action against plaintiff." Dkt. 38-3 at 16.  However as discussed above, Plaintiff presents no allegations plausibly indicating that the School District was substantively involved in the criminal prosecution beyond presenting the complaint to the police on March 30, 2018.  Accordingly, all state law claims brought by Donovan on her own behalf, whether against the School District or the individual defendants, are barred by the applicable statute of limitations.

Plaintiff argues, however, that her daughter's infancy tolls the running of the statute of limitations for all state law claims brought on her daughter's behalf until A.M.Y. turns 18 years of age.  The Court agrees and finds that the statute of limitations on those portions of the state law claims brought on A.M.Y.'s behalf is tolled until A.M.Y. reaches 18 years of age.  *See* N.Y. C.P.L.R. § 208(a).

## VI.   CONCLUSION

For the reasons set forth above, the City of Norwich's motion to dismiss, Dkt. 29, is **GRANTED**, and all claims against the City of Norwich are **DISMISSED**.

51

The Norwich City School District, Gerald O'Sullivan, Scott Ryan, and Joseph Downey's motion to dismiss, Dkt. 34, is **GRANTED in part and DENIED in part**. The motion is granted to the extent that all claims brought against the School District under Section 1983 are **DISMISSED**, and all state law claims brought by Donovan on her own behalf, whether against the School District or the individual defendants, are **DISMISSED**. The motion is denied in all other respects.

Plaintiff's motion to amend, Dkt. 38, is **DENIED**.

**IT IS SO ORDERED.**

Dated: March 3, 2022

Thomas J. McAvoy
Senior, U.S. District Judge